## CITIZENS' BANK OF LOUISIANA v. BOARD OF ASSESSORS FOR THE PARISH OF ORLEANS et al.

### (Circuit Court, E. D. Louisiana. January 23, 1893.)

#### No. 12,112.

1. TAXATION—EXEMPTIONS—PRESUMPTIONS.

The presumption is always against an exemption from taxation, and the burden is on the party claiming the exemption to establish a legislative intent to that effect by a clear preponderance of persuasive facts.

2. SAME—BANKING CAPITAL—CONSTITUTIONAL LAW.

By the charter of the Citizens' Bank of Louisiana, as amended by Acts La. 1836, p. 16, the state loaned to the bank $12,000,000 of its bonds, of which $7,000,000 were actually used. These bonds were to constitute the capital of the bank, and were indorsed by it and sold. The stockholders were not immediately to pay anything upon their subscriptions, but were merely to furnish mortgages upon cultivated lands and slaves. These mortgages were to be held as security for payment of the bonds, and were to bear 5 per cent. interest. The bank was to build certain railroads and canals, which were ultimately to be turned over to the state, and the state was to have a small share of the profits of the bank, but only a small fraction of the profits were to be distributed either to the state or to the shareholders until after the successive installments of the bonds had been paid. Thus, practically, all the stock, securities, and profits of the bank were pledged and impounded for the payment of the bonds. The act provided that the capital of the bank should be entirely exempt from taxation "during the continuance of its charter." *Held* that, as the exemption was for the purpose of facilitating the repayment to the state of the capital thus advanced, the exemption must be construed to continue, not only for the duration of its charter as then fixed, but for as long as the charter should exist as extended by the state at any future time, for the purpose of securing the repayment of such advances; and, the charter having been extended in 1874, the exemption also continued, although, by the constitution of 1868 then in force, the power of exempting property from taxation, except such as was used for church, school, or charitable purposes, was denied to the legislature.

3. SAME—WAIVER OF EXEMPTION.

None of the bonds having been paid, the legislature, in 1880, (Acts 1880, No. 79,) authorized the bank to compromise and settle the liability of the stockholders upon their mortgages, the sums realized therefrom to be applied in satisfaction of the state bonds, but provided that the act should not take effect unless within 12 months it was accepted, under the conditions prescribed in articles 234 and 237 of the state constitution. Article 234 provided that the legislature should not renew, alter, or amend the charter of any existing corporation, or pass any general or special law for the benefit thereof, except upon condition that such corporation should thereafter "hold its charter subject to the provisions of this constitution." *Held* that, by accepting the act of 1880, the bank consented to waive the exemption from taxation, and the exemption would then have ceased if the legislature had power under the constitution to impose this condition.

4. CONSTITUTIONAL LAW—RIGHT OF PETITION—CORPORATIONS.

Article 5 of the constitution of Louisiana, which declares that the right of the people peaceably to assemble and petition the government, or any

department thereof, shall never be abridged, secures to every person, natural or artificial, the right to apply to any department of the government, including the legislature, for the redress of grievances, or the bestowal of a right, and is also a guaranty of the enjoyment of such redress or right, when obtained, free from all forfeiture or penalty for having sought or obtained it; and when this article is read in connection with article 234, forbidding the legislature to remit the forfeiture of the charter of any existing corporation, or renew, alter, or amend the same, or pass any law for the benefit of such corporation, except upon condition that such corporation shall thereafter hold its charter subject to the provisions of the existing constitution, it is clear that the legislature is prohibited from at all impeding the right of petition, except that, when it has thus granted a favor to a corporation, it may interfere with that right so far as to exact a surrender of all privileges other than those which could be granted under the existing constitution.

**5. SAME—EXEMPTION FROM TAXATION—WAIVER.**

It appearing that it would have been ruinous to the stockholders, and detrimental to the credit of the state, to enforce the payment of the stock mortgages according to the terms of the Citizens' Bank's charter, owing to the destruction of slave property, and the devastation of the war, the act of the state in authorizing the bank to compromise the liability of the stockholders upon their mortgages was for the benefit of the state, and for the purpose of ultimately securing payment of its bonds, and was therefore not a privilege or favor granted to the bank. Hence the legislature had no authority under the constitution to impose upon the bank the condition that the exemption from taxation should be thereafter waived; and, although the bank, by its acceptance of the act, intended to waive the exemption, the attempted waiver was of no effect, and the capital of the bank is still exempt from taxation.

**6. TAXATION—BANK SHARES.**

The imposition of a tax upon the shares of the bank according to the Louisiana statute, which requires the bank to pay the tax, and then look to the dividends upon the shares and to the stockholders for reimbursement, is a tax upon the bank itself. New Orleans v. Houston, 7 Sup. Ct. Rep. 198, 119 U. S. 265, followed.

In Equity. Bill by the Citizens' Bank of Louisiana against the board of assessors for the parish of Orleans and others to enjoin the collection of taxes. Heard on application for an injunction pendente lite. Granted.

Henry C. Miller, for complainant.

E. A. O'Sullivan and Henry Renshaw, for city of New Orleans and board of assessors.

M. J. Cunningham, Atty. Gen., and R. Lyons, for tax collectors.

BILLINGS, District Judge. This case has been submitted upon an application for an injunction pendente lite. The defendants are about to levy and collect a tax upon the shares of the bank. The question to be passed upon is whether the shares are exempted from taxation. The original charter was granted in 1833. Acts 1833, p. 172. That act contemplated that the capital of the bank, which was fixed at $14,000,000, would be obtained by the issuance by the bank of its own bonds. The subscribers for the stock were to pay nothing upon their subscriptions, but were to furnish mortgages upon cultivated lands and slaves to secure the payment of their subscriptions. These mortgages were to be held as a security for the payment of the bonds. The bank, after three years of

effort, found itself unable to negotiate its own bonds. Consequently, in 1836, (Acts 1836, p. 16,) the charter of the bank was amended, and the bonds of the state were loaned to the bank as its capital, to the amount of $12,000,000. The state was to have a graduated interest in the profits of the bank,—a one-sixth interest in case the loan of bonds should be taken to the amount of the full capital. The amount of state bonds actually used by the bank was $7,000,000. In 1852 the charter of the bank, having been forfeited for a failure to comply with the law with reference to specie payment, (Acts 1852, p. 109, No. 141,) was restored to the corporation, and it was reinvested with all the rights and privileges which it enjoyed under the original and amended charter. The original and amended charter of the bank, which was for 51 years, and would have expired in 1884, was in 1874 (Acts 1874, p. 77, No. 40) extended for the further period of 27 years, viz. till 1911. At the time of the granting of the original and amended charters,—i. e. in 1833 and 1836,—there was no constitutional prohibition which directly or inferentially prevented the legislature from exempting from taxation the capital of the bank. In 1874, when the charter was extended, the constitution of 1868 was in force. Article 118 of that constitution is as follows:

"Taxation shall be equal and uniform throughout the state. All property shall be taxed in proportion to its value, to be ascertained as directed by law. The general assembly shall have power to exempt from taxation property actually used for church, school, or charitable purposes. The general assembly may levy an income tax upon all persons pursuing any occupation, trade, or calling; and all such persons shall obtain a license, as provided by law. All tax on incomes shall be pro rata on the amount of income, or business done; and all deeds of sale made, or that may be made, by collectors of taxes, shall be received by courts in evidence as prima facie valid sales. The general assembly shall levy a poll tax on all male inhabitants of this state over twenty-one years old, for school and charitable purposes, which tax shall never exceed one dollar per annum."

The first question is as to the meaning and intent of the legislature in that part of the amended charter of 1836 upon the subject of the exemption of the bank from taxation; that is, the first question is, did the legislature, in the amended charter,—having established certain relations of the state to the bank, and declaring in section 4, p. 17, Acts 1836, "And the capital of said bank shall be exempted from any tax laid by the state, or by any parish or body politic under the authority of the state, during the continuance of its charter," it being provided that "the charter should continue fifty-one years," (section 30, p. 192, Original Charter Acts 1833,)—mean that the exemption should arbitrarily cease at the end of 51 years, or that the exemption should continue so long as the existing relations of the state to the bank should require that the charter should continue?

In dealing with this question, regard must be had to the rule that, when it is claimed a statute creates an exemption from taxation, it is to be strictly construed, and that the presumption is against it. The foundation of this rule shows its meaning. It is founded upon the doctrine that taxation is so essential to the welfare of the state that the contract of exemption must be clearly

shown; that every reasonable doubt should be resolved against it. But this rule does not mean that the inference must, under all circumstances, be against the exemption. It means that the inquiry must be an impartial one; the burden of satisfactorily establishing the exemption being upon him who claims its existence. It must be made to appear to the court affirmatively that the intention of the legislature was to exempt. To apply the rule to this case, the burden is upon the complainants; they must show that by the terms of the exemption, and under the facts as they existed at the time it was granted, the exemption claimed was intended by the legislature, or the right to tax will be inferred. This intent will not be deemed established in case of mere doubt, or a merely ambiguous set of facts; there must be a clear preponderance of persuasive facts in favor of the exemption, or it will be rejected.    Thus, in Tennessee v. Whitworth, 117 U. S. 145, 6 Sup. Ct. Rep. 649, notwithstanding this presumption, it was held that "the right to have shares in a corporation exempt from taxation was conferred upon a corporation by a grant which gave to it all the rights, powers, and privileges of another corporation, if the latter possessed such right of exemption."   I will consider under this rule whether the words "during the continuance of its charter" mean "during the continuance as fixed herein," or "during the continuance as fixed herein, and as the interests of the state may require the legislature hereafter to continue the corporation in existence."   The answer to this question will, as it seems to me, depend upon the object of the legislature in granting the exemption.   This object will best appear from the relations of the state to the bank in 1836. Out of 12 directors, the legislature originally appointed 6, and now it appoints 5.   The state was to have an interest on a graduated scale ranging from one-sixth to one twenty-fourth in the profits of the bank, according to the amount of bonds taken by it. The bonds, to the amount of $12,000,000, to be issued by the state, were made by the state to the order of the bank, and by the latter indorsed, and were thus payable to bearer.   The stock mortgages were transferred to the state, and to whomsoever might be the holders of the bonds.   They were to bear interest at the rate of 5 per cent., and were payable in five installments,—one fifth at February 1st in each of the years 1850, 1859, 1868, 1877, and 1886.   The bank was to build certain railroads and canals, which ultimately were to be turned over to the state, and that portion of the profits belonging to the state should, when available to the state, be devoted to the cause of education in declared proportions throughout the state.   The profits of the bank were to be added to the capital of the bank.   There were to be no dividends among the stockholders, nor distribution of earnings to the state, except out of a small fraction of the profits, and then not till after the successive installments of the bonds had been paid.   It may be remarked that none of the installments of the bonds have been paid.

I will sum up the statutory relations of the state to the bank thus disclosed by saying:   The state furnished the entire capital by the loan of its own bonds, and, till the bonds were paid, all the stock,

securities, or mortgages made by the stock subscribers, were transferred and hypothecated, and all the profits of the bank were pledged and impounded, for the payment of the bonds. This summary suggests the way to reach an answer to the question, how long was the exemption to continue? For 51 years, or so long as the charter relations of the state to the exempted property continued? The object of the exemption must determine its originally expressed period of exemption. Here was an institution which had, and was to have, nothing for itself till its profits had with the stock mortgages paid the state's bonds. The exemption of its capital from taxation was the exemption of something out of which the state's own obligations were to be paid, and the public works—the railroads and canals—which the bank was to build were to be constructed. The exemption was therefore, till the bonds should be paid, a reservation of the state's own property from taxation. One-fifth part of these bonds were not to mature till two years after the original period for the existence of the charter had elapsed. It seems to me that the chief object of the exemption being to facilitate the payment of the state's own bonds, the period of exemption declared must be construed to be so long as the charter was by the legislature continued in order that the state's bonds might be paid. It is true 51 years was a long period, but even in 1836 it was found necessary to make the last installment of the bonds payable 53 years after the original charter commenced. The enterprise was of such great public moment that the state advanced the entire capital, possibly $12,000,000, actually $7,000,000. The exemption was for the purpose of facilitating the repayment to the state for this advance, and the provision for it in the amended charter "during the continuance of its charter" meant, not only as therein fixed, but as the payment of the state's obligations should lead the state afterwards to extend it.

It is the whole charter, the object of the exemption, and the destination of the profits of the institution, which require this inference. The supreme court, in Bank v. Bouny, 32 La. Ann. 245, held that, without regard to this clause expressly exempting from taxation the capital, the reservation of the profits for the extinguishment of the bonds of the state contained in the charter of 1836 prohibited the taxation of the accumulations by the state. If a corporation without capital, save as derived from its profits, is, by the scope and meaning of its charter, so destined and dedicated to the purposes of the state that, even without specific exemption of its accumulations, they cannot be taxed by the state, it must follow that when, in the same charter, the capital is expressly exempted during its existence under the charter, the express exemption is in keeping with the implied, and inheres in the charter throughout its original and prolonged term, if it be kept alive by the state, to render this exclusive destination or dedication available to itself. This was the view of the legislature in 1874, when they extended the charter. The act making that extension is Act No. 40, p. 77, and, with its title and preamble, is as follows:

"Whereas, by reason of the great loss suffered by the agricultural interest of the state in consequence of the late war, it would be ruinous for the stock-

holders to pay within the next thirteen years, before the limitation of the charter of the Citizens' Bank of Louisiana, the amount of arreared installments and interest due by them, as well as the balance of their indebtedness; and whereas, the sacrifice of the lands mortgaged for the payment of the state bonds issued in favor of the bank would endanger the security of the state; and whereas, it is the interest of the state that a prolongation of the charter of the Citizens' Bank of Louisiana be allowed, so as to enable said institution to collect the debts due by the stockholders, and thereby facilitate the payment of the state bonds:

"Section 1. Be it enacted by the senate and house of representatives of the state of Louisiana, in general assembly convened, that the provision of the thirtieth section of the act entitled 'An act to incorporate the Citizens' Bank of Louisiana,' approved April 1, 1833, which reads as follows: 'And the charter shall continue for and during the space of fifty-one years from the passage thereof,'—be amended and re-enacted as follows: 'That the charter of the Citizens' Bank of Louisiana shall continue for and during the space of twenty-five years from and after the time fixed for its liquidation by the said charter, and shall expire on the thirtieth of January, 1911.'

"Sec. 2. Be it further enacted, etc., that the Citizens' Bank of Louisiana, through its board of directors, be, and is hereby, authorized to extend, with the consent of the holders thereof, all the state bonds issued in its favor under the second section of the act entitled 'An act amendatory and supplementary to the several acts relative to the act to incorporate the Citizens' Bank of Louisiana,' approved January 30, 1836, now outstanding, as well as all interest warrants issued by said bank falling due from and after the passage of this act, to such time and on such conditions as may be agreed upon with the holders of said bonds and interest warrants: provided, said extension be not made for a longer period than twenty-five years from the respective maturities, and at no higher rate of interest than the said bonds now bear.

"Sec. 3. Be it further enacted, etc., that the present act shall be in force from and after its passage, any law to the contrary notwithstanding."

There certainly are grave difficulties in the way of maintaining that under this statute, which is a tripartite contract,—that is, a contract between the state, the bank, and the bondholders,—the state can secure the extension of its own bonds for the period of 25 years, and the continuation of the charter which, in effect, destines the profits of the bank to the payment of its bonds for 2 years beyond that period, and at the same time disregard that destination by imposing a tax which, by the decision of the supreme tribunal of the state, is held to be so inconsistent with that destination as to be prohibited by it. It is to be observed that the legislature merely extended the charter, inferring that the original words "during its continuance" carried with them the original exemption throughout the period of the extension. I think in this the legislature drew the inference from the entire charter, which a study of it requires.

The reason in the original charter, as amended in 1836, for making the duration of the exemption coextensive with any prolongation of the charter, inhered in the purpose which was paramount with the state upon the subject of time in connection with the existence of the bank, in that the bank and the exemption must endure till the bonds she had borrowed had been paid; but in the extension of the charter, and the continuance of the exemption, two other parties also had an interest and fixed rights,—the bank and the bondholders.

It is unnecessary to speak of the interest of the bondholders, and there is a complication as to their right to insist upon the exemp-

tion springing from their release of the bank, except so far as relates to the stock mortgages. It may, however, be remarked that, as between the holders of the bonds and the obligors upon the bonds, the state was the maker and principal, and the bank the indorser and surety, though, as between themselves, the bank was under the obligation to pay as the principal. The release of the surety did not discharge the principal, and the state was still left liable as a principal obligor, who had the right to look to the bank for repayment; and thus there exists the same necessity to consider the question of exemption as though there had been no release of the bank by the holders, for the bank had and has an interest subordinate only to that of the state in having the exemption maintained. The period of its existence, and with it the right of the state to participate in its profits, to the extent of reserving one-sixth part thereof, and the pledge and impounding of all its profits, were continued along with its existence for the further period of 27 years. It was the payee and second obligor upon the state bonds whose payment was by the same act postponed. It has a right, therefore, as trustee for its own stockholders, to insist upon the exemption, unless it has by some act waived this right.

The respondents, the tax officers, say it has waived this right by assenting to the condition of Act No. 79, Acts 1880. It is conceded that the directors of the bank gave the assent, as required by that act. The act is as follows:

"Whereas, due proof has been shown to the house in which this bill originated that article 48 of the constitution has been complied with, therefore:

"Section 1. Be it enacted by the general assembly of the state of Louisiana, that the Citizens' Bank of Louisiana, in addition to the powers now conferred by law, shall have power to compromise and settle the liability of the mortgage stockholders of said bank arising out of the stock mortgages granted by them to secure their subscriptions to the capital stock of said bank; said compromises to be made when deemed judicious by said bank, and with the assent of the bondholders: provided, the same be approved by the directors on the part of the state, as provided in this act, on such terms as may be agreed upon; and, when effected, the said stock mortgages to be released and canceled.

"Second. That all sums realized from said compromises, as well as from the enforcement of said mortgages, by the usual legal proceedings, shall be held and applied by the banking department of said bank to the satisfaction of the bonds of the state, issued in aid of the bank, and to the legal liabilities of said mortgage stock department, and to the necessary expenses of said department.

"Third. That the directors for the state on the board of said bank shall be increased to five, to be appointed by the governor, when this act shall be accepted by the bank, whose duties shall be the same as now provided by law; and, in addition thereto, they shall supervise the compromise, as contemplated in section one of this act, and for this purpose they shall hold meetings, when called upon so to meet by the president of the board of directors of the Citizens' Bank, and shall keep a record of their meetings, and no compromises under the provisions of this act shall be effected without the approval of the majority of said directors on the part of the state.

"Fourth. That this act shall not be binding or confer any right upon the bank unless accepted within twelve months from the date of this act, and under the conditions prescribed in articles 234 and 237 of the constitution; such acceptance to be manifested by the bank in writing, and filed in the office of the secretary of state. * * *"

It is claimed, and I think justly, that the meaning of the assent is that the directors agreed to waive the exemption, as they did all other special privileges enjoyed by the bank, as required by the legislature. If the legislature had a right, under the constitution, to require this agreement as a condition of an act or statute inuring to the benefit of the bank, then the agreement to waive is valid and obligatory. If the legislature, under the constitution, had not the right to require this agreement as such a condition, then the agreement is void, and the rights of the bank are unaffected by it. In order to determine this question, we must look at two provisions of the constitution,—article 234, and article 5. These articles are as follows, (article 234:)

"The general assembly shall not remit the forfeiture of the charter of any corporation now existing, nor renew, alter, or amend the same, nor pass any general or special law for the benefit of such corporation, except upon the condition that such corporation·shall thereafter hold its charter subject to the provisions of this constitution."

Article 5 is as follows:

"The right of the people peaceably to assemble and petition the government, or any department thereof, shall never be abridged."

I take it to be undeniable that the "right of petition," as that expression is used in the constitution of the state, means the right of every being, natural and artificial, to apply to any department of government, including the legislature, for the redress of grievance or the bestowal of right, and is a further guaranty of the enjoyment of such redress or right when obtained, free from all forfeiture or penalty for having sought or obtained it. If these two provisions are read together, it is clear that they mean that the constitution prohibited the legislature from at all impeding the right of petition, except that in case it remitted a forfeiture to a corporation, or altered its charter, or passed any general or special law for its benefit, it might interfere with that right, so far as to` exact a surrender of all privileges other than those which could be granted under the existing constitution. This was a power given to the legislature in case the alteration or amendment or general or special law was for the benefit of the corporation, and not, as in this case, where the amendment—the special law—was to enable the bank to apply certain securities to the payment of obligations upon which the state was an obligor, and thus to protect the credit of the state.

The ·question turns upon whether the thing sought was such a thing as is meant and specified in article 234. The thing granted was for the bank, with the assent of the directors appointed by the state, to realize for the state and bondholders out of the stock mortgages by compromise, i. e. without a foreclosure and sale. These stock mortgages were hypothecations of plantations and slaves. The destruction of slavery had reduced the value of the hypothecations more than half, or possibly two thirds. It was necessary to find a purchaser for the mortgaged property, and at a price equal to the par value of the stock of the subscriber, or for the bank itself to ·become the purchaser of the property. The

first was impossible; the second was ruinous for the state. Therefore it was enacted that, with the consent of the state's representatives, the bank might, upon receipt of a fair sum, by way of adjustment, release any of the mortgaged property, and apply the sum realized to the payment of the state's bonds. This was in no true sense a law passed for the benefit of the bank. It was rather a legislative permission to resort to the only practicable method of making the mortgages available to the extinguishment of the state's bonds, and should be denominated as a law passed by the state for the benefit of itself. Again, it was in no sense the creation of a special right, but was rather the recognition by the state of a right evidently existing, which any court of equity would, in a case where all the parties were before the court, have recognized, without the act of 1880. It would follow that the legislature, in compelling the bank to make any renunciation in order to have force and operation given to that statute, acted, not only without authority, but in defiance of the constitutional prohibition which forbade it to impede the right of petition, except in a certain class of cases, of which the application for the grant of recognition contained in the act of 1880 was not one; and that the renunciation exacted from the bank by the legislature, in violation of the constitution of the state, is void.

My conclusion, therefore, is that the original charter contemplated and declared that the exemption should be coextensive with the charter, and that the bank has done nothing which can prevent her from insisting upon her capital being exempt from taxation, in accordance with the terms of her charter. The thing sought by this bill to be preserved from taxation is the shares of the stockholders. The thing exempted in the charter eo nomine, is the capital of the bank. In Bank v. Bouny, supra, the supreme court of this state held that, since the profits were pledged and impounded for the payment of the state's bonds, taxation by the state of the accumulations and of the shares was prohibited. In New Orleans v. Houston, 119 U. S. 265, 7 Sup. Ct. Rep. 198, the supreme court of the United States held that under the statute prescribing the manner of collecting a tax upon the shares of a corporation, as it then existed, (and it is unchanged,) since the corporation is required to pay the tax, and must look to the dividends upon the shares and to the stockholders for reimbursement, it was a tax upon the corporation itself. A fortiori would this be true when dividends are prohibited, and the profits or earnings of the corporations are otherwise destined. Let, therefore, the injunction pendente lite issue.